William R. Ost and Helen L. Ost v. Commissioner.
Ost v. Commissioner
Docket No. 59770. TC Memo. 1958-18.
United States Tax Court
T.C. Memo 1958-18; 1958 Tax Ct. Memo LEXIS 219; 17 T.C.M. (CCH) 80; T.C.M. (RIA) 58018; January 31, 1958
*219 In 1929, while employed by Air Reduction Company, Incorporated, petitioner William R. Ost invented a process which facilitated the joining together of pipe joints. In 1931 and 1934 petitioner signed agreements with Air Reduction which purported to assign to the latter the invention he had perfected. Thereafter, Air Reduction patented the invention and purported to assign the patent to Walworth Company, which employed petitioner to develop the invention and train personnel to apply it. Petitioner maintained that he owned the patent and retained an attorney to represent him. The attorney threatened Air Reduction and Walworth with lawsuits unless they agreed to compensate petitioner for his rights in the invention. On June 8, 1942, Air Reduction and Walworth signed an agreement under which petitioner was to receive a specified percentage of the net sales of devices manufactured under the patent on his invention. Held: On the facts, one-half of the amounts received by petitioner in 1951 and 1952 pursuant to the agreement of June 8, 1942, represented compensation for services and are taxable as ordinary income. Held further: The other half of the payments made in 1951 and 1952 were made *220 in settlement of petitioner's rights in the patent on his invention and are taxable as capital gains. Rose Marie Reid, 26 T.C. 622. John L. Costello, Esq., for the petitioners. Henry L. Glenn, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income tax of petitioners as follows: Year
Amount
1951
$ 6,588.30
1952
12,458.47 The sole issue is whether certain amounts received by petitioners in the taxable years represented ordinary income or capital gain from the sale of a patent. Findings of Fact Petitioners are husband and wife, residing at Old Chester Road, Essex Fells, New Jersey. For the calendar years 1951 and 1952 they filed joint Federal income tax returns with the collector of internal revenue for the fifth district of New Jersey. In 1925, petitioner William R. Ost (hereinafter referred to as petitioner) was employed by Air Reduction Company, Inc. (hereinafter referred to as Airco) as an engineer in the Applied Engineering Department. The principal business of Airco was the manufacture of welding gases. Petitioner's job was not to invent *221 or develop new products but to find new uses for existing Airco products. In 1929, petitioner began working on an invention in his spare time. This invention (hereinafter referred to as "the invention") was an improvement relating to pipe joints, which is also known as a method of making short radius turns. The invention facilitated the joining together of cylindrical shapes by the use of low temperature brazing alloys, and it enabled brazing to take place in remote places away from a high temperature furnace. By 1931, petitioner had become convinced that a market for this type of brazing could be established, and he brought the invention to the attention of his immediate superior. Thereafter, Airco asked petitioner if he would agree to assign to Airco all processes invented by him during his employment. From his discussion with officials of Airco, petitioner understood that the proposed agreement would apply only to inventions which could be used by Airco in its business. On November 21, 1931, petitioner signed an "Agreement to Assign Inventions" with Airco which provided in part: * * *
"1. The Employee covenants and agrees for the entire period of his employment under *222 this agreement, promptly to disclose and to assign to the Company all inventions and improvements in processes, apparatus and formulae, made or conceived by him during such period of employment and relating to or capable of beneficial use in the development or extension of the manufacturing or producing activities of the Company, and to execute, immediately upon request, all necessary documents and to assist the Company in every way, (entirely at its expense) to obtain, for its sole benefit, patents on all such inventions and improvements in all countries. "2. The Employee further covenants and agrees that he will not enter into any negotiations with any person, firm or corporation, other than the Company, relative to the disclosure or disposal of any inventions or improvements, made or conceived by him during his employment, or file applications for patents covering such inventions or improvements, until he has first submitted such inventions or improvements to the Company and has obtained a written release with respect thereto, signed by an Officer of the Company as hereinafter provided. "3. It is understood and agreed by and between the parties to this agreement that upon the *223 submission to the Company by the Employee of any invention or improvement, a Committee consisting of an Officer of the Company, the inventor and a third party, selected by and agreeable to both, shall, at the request of the inventor, promptly determine whether the invention is assignable to the Company under the provisions of Article 1 hereof, due weight being given in the event of doubt, to facts showing that the invention was or was not developed with the materials or assistance of the Company; and should the invention be decided by the Committee to be non-assignable to the Company, the Employee shall be promptly released in writing with respect thereto and authorized to take such steps as he may deem advisable for securing patent protection covering his invention or improvements for his own benefit. A majority vote of the Committee shall determine the question presented and the decision of the Committee shall be final and binding on both parties. "4. The Employee further covenants and agrees that without the written consent of an Officer of the Company, he will not disclose to any person, firm or corporation, either during or after the term of his employment under this agreement *224 any secret information obtained by him while in the employ of the Company, and he further agrees that if he leaves the employ of the Company, he will not take with him without the written consent of an Officer of the Company, any drawing, blueprint or other reproduction of confidential information. "5. The Company hereby covenants and agrees to pay the Employee the compensation already agreed upon, or which shall from time to time be agreed upon between the parties hereto, in full for all services rendered and for the assignment of inventions and improvements to the Company pursuant to this agreement. "6. The Company further covenants and agrees to pay the Employee at a reasonable rate for time actually spent by him, at the request of the Company and after the termination of his employment with the Company, on all work necessary for the completion of inventions or improvements made or conceived by the Employee during his employment, and it is understood and agreed that the termination of the Employee's employment hereunder shall not release the Employee from his obligation to the Company with respect to the assignment of inventions and improvements made by him while in the employ *225 of the Company. "7. The Employee hereby covenants that he has filed no applications, for patents for inventions, which are pending at the date of this agreement and which are not subject thereto or not already assigned to the Company, except as specified in a list hereto annexed, and the Employee further covenants that such list, if annexed, is complete." * * *
At the time this agreement was signed by petitioner and Airco officials, a memorandum in petitioner's handwriting and dated 11/21/31 was attached to the agreement. This handwritten memorandum provided as follows: "11/21/31 "The following list covers the items which I wish to be exempt from the provisions of this agreement. These items cover work of myself in conjunction with other parties to get patents covering such items "1. Metal spraying torch device 2. A method of making short radius turns 3. A design of an all welded dwelling involving tubular and structural shapes. "/sgd./ William R. Ost" Both petitioner and Airco officials were aware of the handwritten memorandum when the agreement was signed. Airco did not object to the memorandum because the items contained therein could not be used in its business. *226 After paragraph 7, but before the signature paragraph of the agreement signed by petitioner and Airco, the words "List is attached" in petitioner's handwriting appear. Petitioner intended these words to refer to the handwritten memorandum which he had attached to the agreement as a record of the inventions which were exempt from the agreement to assign inventions. In 1934, petitioner was approached by his superior, W. H. Luddington, and advised to patent the invention. Petitioner was informed that he would have to assign any patent on the invention to Airco or lose his job. On January 19, 1934, petitioner executed an assignment of the invention and application for patent thereof which provided as follows: "Assignment "In consideration of One Dollar and other good and valuable considerations, of which I acknowledge receipt, I, WILLIAM R. OST, of Verona, New Jersey, sell and assign to AIR REDUCTION COMPANY, INCORPORATED, a New York corporation, having an office and place of business at 60 East 42nd Street, New York, N. Y., its successors and assigns, the Improvements Relating to Pipe Joints invented by me, and the application for United States Letters Patent therefor executed *227 concurrently herewith, and all patents which may be granted therefor, and all divisions, reissues, continuations and extensions thereof, and authorize and request the Commissioner of Patents to issue all patents on said improvements or resulting therefrom to said AIR REDUCTION COMPANY, INCORPORATED, as assignee of the entire interest, and covenant that I have full right so to do, and agree that I will communicate to said AIR REDUCTION COMPANY, INCORPORATED, or its representatives, any facts known to me respecting said improvements, and testify in any legal proceeding, sign all lawful papers, execute all divisional, continuing and reissue applications, make all rightful oaths, and generally do everything possible to aid said AIR REDUCTION COMPANY, INCORPORATED, its successors, assigns and nominees, to obtain and enforce proper patent protection for said invention in all countries, including the right to apply for letters patent in foreign countries in its own name and to claim priority therefor under the International Convention. "IN WITNESS WHEREOF, I have hereunto set my hand and seal this 19th day of January, 1934. "WILLIAM R. OST /L.S./" Also on January 19, 1934, petitioner *228 submitted an office memorandum to Luddington which provided: "Date 1-19-34 "Subject: Assignment of Patent Covering Joint, Brazing Operation Employing Silfos on Pipe Fittings "With your request I am herewith signing a petition and power of attorney, oath and assignment without prejudice in relation to my rights under clauses one and three of the Company general agreement 'Agreement to assign inventions' in order to expedite the application of this patent, in accordance with the best interest of Air Reduction Sales Company. "/sgd./ William R. Ost "W. R. OST "WRO:HM Applied Engineering" Petitioner refused to sign the 1934 assignment until Airco agreed that by such action petitioner would not jeopardize his rights under the 1931 agreement and memorandum. Petitioner was told that he could not seek arbitration under clause 3 of the 1931 agreement until a patent had been secured. In 1934, petitioner was assigned to the Walworth Company (hereinafter referred to as Walworth) to assist in the development of markets for the invention and to train personnel to apply the invention. He began receiving a salary from Walworth in that year. Thereafter, petitioner's salary from Airco *229 was reduced to a nominal amount for advisory services. Petitioner was employed by Walworth continuously from 1934 to the time of the hearing. On August 11, 1936, patent No. 2,050,728 on the invention was issued in petitioner's name. In the same year petitioner requested a clarification of his rights with respect to this patent and discussed the matter with Airco officials. Petitioner requested arbitration under clause 3 of the 1931 agreement, but no arbitration proceedings were ever commenced. During the years 1936 to 1939, inclusive, petitioner continued to insist that he was the owner of the patent on the invention, but Airco did not pay him anything for his interest in the patent. During this same period, Walworth used the patent and derived income from such use. Petitioner's only income from Walworth in these years was salary for promoting the use of the invention. On June 1, 1939, Airco entered into an agreement with Walworth and Walworth Patents, Inc., which provided in part as follows: * * *
"2. Promptly upon the execution of this agreement Airco agrees to execute, acknowledge and deliver to Walworth Patents an assignment of the entire rights, title and interest *230 in and to the United States Letters Patent No. 2,050,728 and the invention therein disclosed, described or claimed in the form attached, marked Exhibit 'A,' and thereafter, when requested by Walworth or Walworth Patents to execute assignments of said foreign patents. Airco also agrees to assign to Walworth Patents any and all of the domestic and foreign patents and patent applications constituting improvements on the subject matter of the Assigned Patents which Airco may hereafter own or acquire. "3. Airco hereby warrants that it is the sole and exclusive owner of the entire right, title and interest in and to the Assigned Patents, that they are not mortgaged or otherwise encumbered, and that none of the rights granted to it by said Assigned Patents has been assigned to any person, firm or corporation by license, grant or otherwise. "4. In consideration of this assignment and transfer, Walworth agrees to pay Airco Twenty-Five Thousand ($25,000.00) Dollars, in the form of quarterly instalments of Twelve Hundred and Fifty ($1250.00) Dollars, payable on or before the end of each quarter beginning April 1, 1939. "5. In further consideration of such assignment and transfer, it is *231 agreed as follows: "(a) Walworth and Walworth Patents jointly and severally agree to pay Airco a royalty of one and one-half (1 1/2) per cent of the net sales price of all devices embodying any one or more of the inventions of said Assigned Patents sold on and after April 1, 1944 by Walworth or Walworth Patents or any company now or hereafter owned or controlled by Walworth or Walworth Patents. "(b) Walworth and Walworth Patents jointly and severally agree to pay Airco ten (10%) per cent of all sums received from licensees other than Walworth as royalties or license fees on account of the manufacture, use, practice, or sale of the devices, articles, and methods embodying the inventions of said Assigned Patents. * * *
"8. In the event that the Ost United States Patent No. 2,050,728 should be declared invalid by a court of competent jurisdiction, then this contract may be forthwith cancelled and terminated by Walworth and Walworth Patents, at their option, and they shall be relieved of all further liability hereunder PROVIDED THAT Walworth or Walworth Patents pays to Airco all amounts then accrued and that the Assigned patents are reassigned to Airco. "9. In the event that *232 Walworth ceases the manufacture, use or sale of devices embodying the invention of United States Letters Patent No. 2,050,728 because of patent infringement, then Walworth and Walworth Patents may cancel and terminate this agreement and be relieved of all further liability hereunder, PROVIDED THAT Walworth and Walworth Patents pays to Airco all amounts then accrued and that the Assigned Patents are reassigned to Airco. "10. Walworth Patents covenants and agrees that the entire right, title, and interest in and to the Assigned Patents, assigned to it pursuant to this agreement, shall be non-assignable to Walworth or any other person, firm, or corporation, it being understood, however, that Walworth Patents shall have the right to grant non-exclusive licenses to Walworth and others to manufacture, use, practice or sell the devices, articles and methods embodying the inventions of said Assigned Patents in accordance with the terms of this agreement. "11. In the event of cancellation of this agreement or its termination in any other manner, then Walworth and Walworth Patents shall have the right to complete any and all contracts for the sale of devices embodying the inventions of the *233 Assigned Patents that may be booked or that they have become obligated for and may complete and sell such parts that may be on hand at such expiration, provided that royalties therefor are paid as herein specified." [The percentage set forth in paragraph 5(a) was changed from 1 1/2 per cent to 1 1/4 per cent by an amending agreement dated June 8, 1942.] * * *
Within the period beginning in June of 1939 and ending in June of 1942, Walworth paid Airco $15,000 in twelve quarterly installments under the terms of the royalty provisions contained in the agreement dated June 1, 1939. On receipt of these payments during this period Airco delivered to petitioner checks in the amount of $125 each quarter as compensation to petitioner for the invention. By June of 1942, petitioner had received checks from Airco totaling $1,500. Petitioner did not present for payment any of the checks delivered to him by Airco. Early in 1942, petitioner sought the advice of William B. Shealy, an attorney, claiming that he owned the patent on the invention and that Walworth and Airco were not compensating him for the use of the patent. Shealy informed petitioner that in his opinion petitioner was the *234 owner of the patent and entitled to fair compensation for it. Shealy began negotiations with officials of Walworth and Airco in regard to petitioner's rights in the patent. He threatened both with suits to enjoin the use of the patent and for damages if petitioner was not satisfactorily compensated. Subsequently, Airco and Walworth entered into an agreement with petitioner. This agreement, dated June 8, 1942, provided inter alia as follows: * * *
"1. Airco agrees to pay to Ost simultaneously with the execution and delivery of this agreement the sum of Fifteen Hundred Dollars ($1500.), which, together with Fifteen Hundred Dollars ($1500.) represented by the checks heretofore delivered by Airco to Ost, as aforesaid, represents twenty (20) per cent of the aggregate of the One thousand two hundred fifty Dollar ($1,250) quarterly installments heretofore received by Airco from Walworth, as aforesaid, and further agrees that as and when further quarterly installments of One thousand two hundred fifty Dollars ($1,250) each are paid to it by Walworth pursuant to the provisions of the Royalty Agreement, it will pay to Ost, his heirs, administrators or executors, amounts equal to twenty *235 (20) per cent of such further installments. "2. Walworth agrees that as and when royalties of one and one-quarter (1 1/4) per cent of net sales price of devices embodying any one or more of the inventions of the Assigned Patents become due to Airco under the provisions of the Royalty Agreement, Walworth will pay to Ost, his heirs, administrators or executors, amounts equal to one-half of one per cent (1/2%) of such net sales; provided, however, that if at any time during his life Ost shall not be employed by Walworth or Walworth Patents or any company owned or controlled by Walworth or Walworth Patents and shall not be in the armed services of the United States of America, such rate of one-half of one per cent (1/2%) of such net sales shall, in respect of net sales made during such period as Ost shall not have been employed by Walworth or Walworth Patents or any company owned or controlled by Walworth or Walworth Patents and shall not be in the armed services of the United States of America, be reduced to one-quarter of one per cent (1/4%) of such net sales price; provided, further, however, that if Ost shall be in the armed services of the United States of America such rate of one-half *236 of one per cent (1/2%) of such net sales price shall, in respect of net sales made during such period as Ost shall have been in the armed services of the United States of America, be reduced to one quarter of one per cent (1/4%) of such net sales price unless immediately prior to his entry into the armed services of the United States of America Ost shall have been in the employ of Walworth or Walworth Patents or any company owned or controlled by Walworth or Walworth Patents; and provided further, however, that if Ost shall die such rate of one-half of one per cent (1/2%) of such net sales price shall, in respect of net sales made after his death, be reduced to one-quarter of one per cent (1/4%) of such net sales price unless immediately prior to his death Ost shall (a) have been in the employ of Walworth or Walworth Patents or any company owned or controlled by Walworth or Walworth Patents, or (b) have been in the armed services of the United States of America and immediately prior to entering such armed services shall have been in the employ of Walworth or Walworth Patents or any company owned or controlled by Walworth or Walworth Patents. "3. Walworth and Airco agree that no agreement *237 which they may enter into amendatory of the Royalty Agreement or otherwise shall in any way affect the payments required to be made to Ost hereunder, which payments shall continue to be made as if no such agreement amendatory of the Royalty Agreement or otherwise shall have been made. "4. By the making of this agreement neither Airco nor Walworth admits the prior existence of any legal liability to Ost in the premises. "5. Ost hereby releases Airco and Walworth from any and all obligations to him in respect of the inventions covered by the Assigned Patents other than the respective obligations of Airco and Walworth to make the payments provided for in this agreement to be made by them respectively. "6. The rights of Ost under paragraph 1 of this contract shall not be assigned without the consent of Airco and the rights of Ost under paragraph 2 of this contract shall not be assigned without the consent of Walworth." * * *
For his services to Walworth, petitioner has received from Walworth the following amounts of salary in the years indicated: 1940
$ 5,549
1941
8,150
1942
9,100
1943
10,500
1944
9,300
1945
10,546
1946
11,325
1947
12,062
1948
$13,172
1949
12,945
1950
13,520
1951
14,127
1952
16,436
1953
14,262
1954
15,700
*238 In addition to salary, petitioner received from Walworth $15,817.11 in 1951 and $28,133.69 in 1952 pursuant to the agreement of June 8, 1942. Petitioner has never engaged in the business of being an inventor nor has he ever sold patents in the ordinary course of a trade or business. Opinion Under section 117(q) of the Internal Revenue Code of 1939, the provision which is applicable to the years in issue here, [1] a transfer by the inventor of an undivided interest in property which includes a part of all the substantial rights to a patent is considered the sale or exchange of a capital asset held for more than six months regardless of whether or not payments in consideration of such transfer are contingent on the productivity, use or disposition of the property transferred. Respondent concedes that this section eliminates questions as to whether the patent rights involved in this case constitute a capital asset and as to the length of time the rights have been held. The only issue is whether the payments made to petitioner in 1951 and 1952, or any part of such payments, were payments made in consideration of a transfer of patent rights and therefore taxable as capital gains *239 or whether they constituted compensation for services and are taxable as ordinary income. The amounts in issue were paid under the terms of an agreement signed by Airco, Walworth and petitioner on June 8, 1942. In that agreement Walworth agreed to pay petitioner amounts equal to one-half of one per cent of net sales of devices embodying the patent on petitioner's invention. However, the agreement also provided that during such time as petitioner was not employed by Walworth he was to receive only one-quarter of one per cent of net sales. If petitioner died or went into the armed services, the agreement provided that his percentage of net sales would drop to one-quarter of one per cent unless immediately prior to either eventuality petitioner was a Walworth employee, in which case he would receive the full one-half of one per cent. In other words, petitioner was to receive twice as much under the contract if he continued *240 in Walworth's employ. The record is clear that petitioner was employed by Walworth throughout the taxable years. Thus, one-half of the payments made in 1951 and 1952 were directly attributable to petitioner's employment with Walworth. Petitioner had worked at Walworth's continuously since 1934, assisting in the development of markets for the invention and training personnel to apply it. The officials at Walworth regarded petitioner highly for his industriousness and his inventive genius and the attorney consulted by petitioner concerning his patent rights testified that the clause in the agreements which provided for reducing the payments to petitioner by one-half if he left Walworth's employ was included at the request of Walworth officials "as an inducement to Mr. Ost * * * to remain with Walworth." Clearly, one-half of the amounts paid to petitioner in 1951 and 1952 under the agreement represented compensation for services and not for the transfer of any patent rights. We therefore hold that one-half of the sums in issue are taxable as ordinary income. Arthur C. Ruge, 26 T.C. 138; Arthur N. Blum, 11 T.C. 101, affd. (C.A. 3, 1950), 183 Fed. (2d) 281. *241 See also Spence v. United States, 156 Fed. Supp. 556 (Ct. Cls., Dec. 4, 1957). The remaining half of the amounts paid to petitioner in 1951 and 1952 pursuant to the terms of the agreement dated June 8, 1942, do not represent compensation for services. These amounts were payable to petitioner even though he did not work for Walworth, and there is no testimony in the record to indicate that these payments were intended as additional salary. The facts leading up to the signing of the agreement dated June 8, 1942, establish beyond question that the provision in the agreement providing for the payment of one-quarter of one per cent of net sales even if petitioner was not in Walworth's employ was inserted in respect to petitioner's transfer of rights to the invention and patent. Although petitioner signed agreements in 1931 and 1934 which purported to transfer all of his rights in the invention to Airco, petitioner offered in evidence two memoranda bearing the same dates as the agreements, in which he had attempted to reserve his rights in the invention. Petitioner testified that he intended to exclude the invention from the terms of the 1931 agreement and that he signed *242 the 1934 agreement so that a patent could be obtained. He thought he was protecting his rights of ownership by the memoranda. Furthermore, the record reveals other evidence that petitioner consistently maintained his rights of ownership in the invention. Even after Airco sent him checks totaling $1,500 out of the royalty payments Walworth paid to Airco for the use of the patent, petitioner refused to surrender his claim. He did not present the checks for payment but sought the advice of an attorney. The attorney voiced the opinion that petitioner was the owner of the patent and entitled to compensation for it. The attorney negotiated with Airco and Walworth and threatened suit against both. Thereafter, Airco and Walworth agreed to the settlement reflected in the agreement dated June 8, 1942. These facts do not reveal any suggestion that the payments to be made to petitioner regardless of his employment with Walworth were to be made for any other purpose than to compensate petitioner for the transfer of his interest in the invention. In Rose Marie Reid, 26 T.C. 622, in which payments similar to those in issue here were involved, this Court said: * * *
"We do not *243 deem it important that petitioner transferred her interests in 1946, whereas the agreement giving rise to the payments in question was executed in 1949. Even in the absence of any dispute as to whether Californian's rights to petitioner's trade name and inventions were perfected or indefeasible, the payments in question were made in respect of the transfer of such rights. Whether they be viewed as payments for finally perfecting those rights, or additional consideration for that to which Californian was already entitled, they were in consideration of the transfer of the trade name and inventions, and not for personal services, and represent capital gains to petitioner. Hofferbert v. Briggs, supra. "In the instant proceeding, however, it is clear that there was in fact a serious dispute as to the perfection of Californian's title, or as to its rights to retain title as against petitioner. Respondent has attempted to discuss the merits of petitioner's claim of a right to rescind the 1946 agreement and recover her assets. He argues that she could not. In our opinion, it is of no moment whether petitioner would have prevailed had she litigated the matter to final judgment. We cannot *244 say, despite respondent's arguments, that it is manifestly clear that she could not. The determinative factor is that petitioner believed in good faith that she could, and was so advised by counsel. Her claim was certainly not frivolous, and was taken seriously enough by Kessler and Californian. Had she commenced litigation seeking rescission and settled her suit for the payments in question, we would have no doubt that those payments would be entitled to treatment as capital gains. Albert J. Goldsmith, 22 T.C. 1137; Margery K. Megargel, 3 T.C. 238. Here commencement of an action to rescind was rendered unnecessary by the willingness of the parties to settle their differences shortly after retention of counsel by petitioner. Nevertheless, the underlying claim remained the same, i.e., title to the trade name and patents, and amounts received by petitioner in settlement thereof must be held referable thereto. Cf. Lyeth v. Hoey, 305 U.S. 188. * * *
Whether petitioner's rights in the invention and patent were actually transferred in 1931 or 1934, as claimed by respondent, or in 1942, as claimed by petitioner, is therefore not important. If *245 one-half of the payments in issue represented either consideration for perfecting title or additional consideration for that to which Airco and Walworth were already entitled, the sums were nevertheless in consideration of the transfer of the invention and patent. Rose Marie Reid, supra. It appears that petitioner's claim of ownership of the invention and patent was not frivolous. Prior to the agreement of June 8, 1942, petitioner consistently maintained his claim of title to the invention; he approached officials of Airco and Walworth concerning the subject; and he finally sought the services of an attorney. The attorney believed petitioner's claim was a valid one and subsequently threatened Airco and Walworth with suits to enjoin the use of the patent and for damages. Whether such suits would have been successful is not determinative. What is important is that Airco and Walworth considered the claim meritorious enough to sign the agreement of June 8, 1942. We therefore hold that one-half of the amounts paid to petitioner in 1951 and 1952 were paid in settlement of petitioner's claim against the title to the invention and patent and are taxable as capital gains. Rose Marie Reid, supra. *246 Decision will be entered under Rule 50. Footnotes
1. Section 117(q)↩ was added by P.L. 629, June 29, 1956, 80 Stat. 404, and applies to any amount received pursuant to a transfer of patent rights in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred.