Carl E. WELLER and Emily I. Weller, Plaintiffs,

v.

Richard P. BROWNELL, Defendant (two cases).

Civ. Nos. 8120, 8187.

United States District Court Middle District Pennsylvania.

March 31, 1965.

Joseph E. Gallagher, Scranton, Pa., Norman A. Peil, Jr., Bernard M. Goodman, Easton, Pa., for plaintiffs.

Bernard J. Brown, U. S. Atty., Scranton, Pa., for defendant.

NEALON, District Judge.

## OPINION

In this non-jury action,[1] plaintiffs, Carl E. Weller and Emily I. Weller, his wife, sue to recover for allegedly overpaying their tax liability for the years 1955, 1956 and 1957. Plaintiffs contend the defendant, Richard P. Brownell, former District Director of Internal Revenue for the Scranton, Pennsylvania, District, erred when (a) he treated royalties from the sale of patent reissue rights as ordinary income instead of capital gains, (b) he did not allow capital gains treatment for the transfer of patent rights to a partnership of which plaintiffs were partners, (c) he allocated the amount recovered in a patent infringement suit between plaintiffs and trusts created by plaintiffs, instead of charging the full amount to the trusts which actually received the proceeds from the suit, and (d) he charged plaintiff, Carl E. Weller, with a salary of $12,000.00 per annum, notwithstanding the fact that Weller received no salary from the partnership and spent less than one-fifth of his time on partnership activities.

A hearing was held July 13, 1964, and from the testimony, stipulations, pleadings and exhibits, I find the following facts:

In 1941, Carl E. Weller, the taxpayer, while working for his brother as a radio repairman, conceived the idea for the Weller soldering gun. The unique feature of the tool was the rapid heating and cooling of the tip used to melt the solder, so that it eliminated the previous long delays involved in waiting for a soldering iron to heat and then to cool after being used. On July 14, 1941, the taxpayer filed with the United States Patent Office an application for a patent on an "Electrical Heating Apparatus." The application was granted on Patent No. 2,405,866 on August 13, 1946. Previ-

1. Civil Action 8120, seeking recovery of overpaid taxes for 1955 and 1956, and Civil Action 8187, seeking recovery of overpaid taxes for 1957, were consolidated for trial.

ous to this, on May 15, 1945, the taxpayer joined in the formation of a general partnership with his wife and several brothers, one of whom was experienced in the field of marketing. Under the terms of the partnership agreement the taxpayer agreed to assign to the partnership his patent on the soldering gun immediately after the issuance of the patent to him in return for royalties of five (5) per cent of the sales of such product for a five-year period. The reason for the five-year period was that taxpayer's brother, Roy, one of the partners, insisted on this arrangement, contending that his experience in the marketing field provided a contribution equivalent to the taxpayer's transfer of his patent. On October 15, 1946, the taxpayer executed an "assignment" of "the full and exclusive right, title and interest in and to the invention aforesaid shown, claimed and described in U. S. Patent No. 2,405,866 and in and to all improvements thereon whether or not such improvements may hereafter be shown, claimed and described in future applications for letters patent * *."

The taxpayer's brother, Roy, who functioned as sales manager, retired in 1947 after two years of active participation in the partnership business. On September 8, 1947, Robert E. Miller became the sales manager and a general partner. On May 2, 1949, a limited partnership was formed under Pennsylvania law in which the taxpayer, his wife, Emily, his brother, Everett, and Robert E. Miller were general partners with his brother, Roy, and his wife, Mamie, and Norman E. Ritter being limited partners.

In 1950, the partnership was informed that products were appearing on the market which appeared similar to the Weller soldering gun and that these products were infringing the Weller patent. After consulting patent counsel for the partnership, it was decided that, before any action was commenced, the record title to the aforesaid patent had to be clarified in view of the previous change in the partnership composition in order to properly vest the patent in the limited partnership then in existence. In order

to accomplish this on September 23, 1950, the original partners assigned to the taxpayer "the entire right, title and interest unto the said Letters Patent therefor aforesaid * * * to the full end of the terms for which said Letters Patent are granted * * *." On the same day the taxpayer assigned to the then existing limited partnership "the whole right, title and interest in the patent aforesaid * * * to the full end of the term for which the said Letters Patent are granted * * *." Thereafter, patent infringement actions were started against Wen Products, Inc., and Drake Electric Works in the United States District Court for the Northern District of Illinois and a similar suit was filed against Wyatt-Cornick, Inc., in the Eastern District of Virginia. It should be noted at this time that only the assignment by the taxpayer in 1946 to the original partnership contained the words "invention and letters patent", whereas the assignments in 1950 contained only the words "patent" and "Letters Patent." Meanwhile, on May 15, 1950, the royalty payments to the taxpayer under the terms of the 1945 agreement ceased.

In order to strengthen the litigating position of the partnership in its infringement suits, patent counsel recommended that a reissue patent application be filed with the United States Patent Office. After becoming aware that an application for a patent reissue must be signed by the inventor, the taxpayer demanded a new royalty agreement for the remaining life of the patent. After a meeting held on June 23, 1952, in the taxpayer's office, the other general partners, consisting of the taxpayer's wife, his brother, Everett, and Robert E. Miller, agreed to an arrangement under which the taxpayer was to receive a three (3) per cent royalty on the sales of products manufactured after the reissue was granted. Thereafter, on July 10, 1952, an application for a patent reissue was made by Carl Weller, and on February 10, 1953, Patent Reissue No. 23,619 was granted to the Weller Manufacturing Company. The soldering gun covered by

the original patent is the same as the soldering gun covered by the reissued patent. The plaintiffs contend that the receipt of these royalty payments constitutes long-term capital gains income under the Internal Revenue Code.

On May 1, 1955, the plaintiffs, Carl and Emily Weller, transferred 16% and 18% interests in the partnership, respectively, into two trusts. At the time of these transfers the patent infringement litigation was pending and on May 8, 1956, the litigation finally terminated in favor of the partnership, as a result of which the partnership received the sum of $250,-000.00 in compensatory damage for patent infringement covering the period from October 4, 1951, to April 30, 1956. Thirty-four per cent was distributed to the Trustee of the two trusts created by the plaintiffs, Carl and Emily Weller. The Government allocated that portion of the compensatory damage attributable to the infringement after May 1, 1955, to the two trusts and that portion attributable to the infringement prior to May 1, 1955, to the plaintiffs, Carl and Emily Weller. The parties have stipulated that if this Court agrees that the patent infringement income should be allocated between the trusts and Carl and Emily Weller, the Government's method of allocation is proper.

Plaintiff, Carl E. Weller, received no salary from the partnership during its fiscal year ending April 30, 1957. During that period he devoted his time to five separate companies, one of which was the partnership. Mr. Weller maintained an office in the partnership plant in Easton, Pennsylvania. He testified that he had no direct responsibilities to the Weller Manufacturing Company partnership in 1957. He drew no salary from any of the companies. For the fiscal years ending April 30, 1946, through April 30, 1952, Mr. Weller drew yearly salaries ranging from $3,110.00 up to $7,200.00. The Government has charged Mr. Weller with $12,000.00 in salary for the year 1957.

## DISCUSSION

I. The first issue to be resolved is whether it was proper for the Commissioner to treat the sale of patent reissue rights as ordinary income instead of capital gains.

While conceding that Section 1235(a) of the Internal Revenue Code of 1954, 26 U.S.C.A., provides that a transfer of all substantial rights in a patent by any holder shall be considered the sale or exchange of a capital asset held for more than six months, the Government strenuously contends that Weller had no rights in a patent which he could transfer to the partnership in 1952 because he had previously assigned the invention covered by the patent in 1946 and the assignee could compel him to execute the application for a patent reissue. On the other hand, taxpayers maintain that Weller had rights in the reissue of the patent because, in the initial assignment, he " * * had not transferred to the partnership his rights as inventor, in the invention itself as well as in and to any reissue of the patent." Taxpayers also take the position that Weller could not have been compelled to execute the necessary papers for a reissue of the patent and, moreover, argues that the question of whether or not Weller had any rights in and to any reissue of the patent was not crucial if the parties to the agreement believed that he might have such rights.

The initial assignment in 1946 specifically stated that the partnership was to have and enjoy the invention and patent for the full term of the patent. As a result of pending patent infringement litigation, patent counsel for the partnership in 1950 advised that new assignments be executed due to the fact that the partnership ownership had changed. Pursuant to this, the original partnership executed an assignment in favor of Weller and he, in turn, executed an assignment in favor of the then existing limited partnership. The language in the habendum clauses of the two assignments is virtually identical. That Weller intended to transfer all his rights

in the invention and patent is clear from the language of the 1946 assignment and the convenient retransfers of 1950 do not change that result. Therefore, I conclude that, as of June, 1952, ownership of the invention and patent had been effectively transferred to the partnership.

Whether or not Weller could have been compelled to execute the petition for a reissue of the patent is also disputed by the parties.

The provisions of the statute in effect when the Weller reissue application was filed in 1952 provided that an application for the reissue of a patent had to be signed by the inventor, if living. See Title 35 U.S.C.A. § 64, 1946 ed. Today, Title 35 U.S.C.A. § 251, which governs reissue patents, no longer has this requirement. In the case of Northrop v. Draper Co., 239 F. 719 (1st Cir. 1917), the question of whether the inventor could be compelled to apply for a reissue of the patent was before the Court. In that case the issue was whether the defendant, Northrop, the inventor-assignor, was under an obligation to the plaintiff-assignee, express or implied, to make application for a reissue. The Court held that there was an implied covenant in the assignment of the patent that Northrop "would make application for reissue in case the patent manifested an intention to claim a feature disclosed therein, but which it failed to state accurately in a claim." In the present case the reissue was applied for in order that the description of the invention be more specific, thereby giving it fuller protection. The soldering gun covered by the original patent is the same as the soldering gun covered by the reissued patent. Thus, there was here an implied covenant in the assignment to apply for a patent reissue if it was deemed necessary to protect the invention assigned.

The plaintiffs cite American Steel Foundries v. Laughlin, 30 F.2d 139 (7th Cir. 1928), in support of their argument that the inventor, Weller, could not be compelled to sign the application for the patent reissue. The facts in that case are inapposite to the facts of the case at bar. In that case the patent assignment specifically provided that the inventor-assignor would join in signing any "lawful and proper application for reissue." The Court found that the original patent for which the reissue was sought contained no defective or insufficient specification and refused to compel the assignor's signature. If there had been a defective or insufficient specification, it would appear that the inventor-assignor could have been compelled to sign the reissue application. Consequently, it is my determination in this case that the plaintiff-inventor could have been compelled to execute the reissue application.

Finding, therefore, that the plaintiff-inventor, Carl Weller, had transferred his rights in the patent and invention to the partnership in 1946 and, also, that the plaintiff-inventor could be compelled to sign the reissue application, the final question to be resolved on this particular issue is whether or not the payments received by Weller under the 1952 agreement constituted capital gain income if the parties to the agreement believed that he might have had some rights therein.

It is the contention of the plaintiffs that "it is not required that the assignor have inviolate and confirmed patent rights to assign. Rather, it is sufficient consideration for an assignment that an inventor merely believes in good faith that he holds patent rights to transfer, and in such case royalties received by transferor are entitled to be treated as capital gain income." In support of this argument, the plaintiffs rely, mainly, on the case of Rose Marie Reid, 26 T.C. 622 (1956), and William R. Ost, 17 T.C.M. 80 (1958). Defendant asserts that neither case will suport the plaintiffs' position and that the payments were not made in exchange for the transfer of an interest in a patent.

In the Reid case (supra), the taxpayer was granted patents on ladies' swim suits and in 1946 formed a California corporation with one Kessler, orally agreeing that Kessler would contribute $50,000.00 in cash for his one-half interest in the corporation and provide a sufficient line

of credit to finance the operations of the company and that in return for her half interest she would surrender to the corporation her rights to her patents, patent applications and trade names. Kessler was to act as business manager and the taxpayer as designer. Kessler's lawyer acted for both in making the arrangements. The corporation prospered and the business grew rapidly, but after a few years differences arose between the parties and in 1949 the taxpayer retained separate counsel to represent her. Threatening a suit for recision of the original agreement and to enjoin the corporation from use of her name and recover her patents and patent applications, the taxpayer obtained a new agreement from the company under which she was paid royalties in return for permitting the company to use her patents then existing or thereafter obtained. The Court made the following finding of fact:

"In 1946 there was a transfer by petitioner of all United States right in respect of her trade name, patents, and patent applications. A disagreement thereafter arose with respect to the existence and nature of the consideration therefor, and a serious question existed as to whether petitioner could rescind, and in so doing prevent further use by Californian of her name and, in addition, recover her patents and patent applications. Petitioner was advised by her counsel and believed in good faith that she could. Neither Kessler nor Californian nor their legal counsel were sufficiently confident that she could not that they were willing to risk legal proceedings and a court adjudication of the issue, if it could be avoided. Under the agreements of April 20, 1949, this misunderstanding was resolved, and the consideration for the transfer, previously in doubt, was definitely fixed."

The Court held that the royalties received by the taxpayer under the later agreement constituted long-term capital gain and not ordinary income as con-

tended by the Government. The opinion pointed out:

"We do not deem it important that petitioner transferred her interests in 1946, whereas the agreement giving rise to the payments in question was executed in 1949. *Even in the absence of any dispute as to whether Californian's rights to petitioner's trade name and inventions were perfected or indefeasible, the payments in question were made in respect of the transfer of such rights.* Whether they be viewed as payments for finally perfecting those rights, *or additional consideration for that to which Californian was already entitled,* they were in consideration of the transfer of the trade name and inventions, and not for personal services, and represent capital gains to petitioner." (Emphasis supplied.)

Moreover, it was noted that there was a serious dispute as to the corporation's rights to retain title as against the taxpayer-inventor. Whether or not there was any merit to the taxpayer's claim was not the determining factor, but rather "that petitioner believed in good faith that she could" prevail if the claim was litigated.

The reasoning of the Court in the Reid case (supra) was followed in the later case of William R. Ost (supra), in which a similar issue was involved. In that case patent rights were assigned by Ost in 1934. In 1942 he entered into another agreement for additional compensation for the transfer of patent rights which the government argued were the same rights transferred in 1934 and, therefore, such compensation did not constitute capital gains. Relying on the Reid decision (supra), the Court concluded:

"Whether petitioner's rights in the invention and patent were actually transferred in 1931 or 1934, as claimed by respondent, or in 1942, as claimed by petitioner, is therefore not important. *If one-half of the payments in issue represented either*

*consideration for perfecting title or additional consideration for that to which Airco and Walworth were already entitled, the sums were nevertheless in consideration of the transfer of the invention and patent.* Rose Marie Reid, supra.

"It appears that petitioner's claim of ownership of the invention and patent was not frivolous. Prior to the agreement of June 8, 1942, petitioner consistently maintained his claim of title to the invention; he approached officials of Airco and Walworth concerning the subject; and he finally sought the services of an attorney. The attorney believed petitioner's claim was a valid one and subsequently threatened Airco and Walworth with suits to enjoin the use of the patent and for damages. *Whether such suits would have been successful is not determinative. What is important is that Airco and Walworth considered the claim meritorious enough to sign the agreement of June 8, 1942.* We therefore hold that one-half of the amounts paid to petitioner in 1951 and 1952 were paid in settlement of petitioner's claim against the title to the invention and patent and are taxable as capital gains. Rose Marie Reid, supra." (Emphasis supplied.)

In Hofferbert v. Briggs, 178 F.2d 743 (4th Cir. 1949), the Court in discussing whether royalties received by the plaintiff from certain inventions and patents were capital gains and not taxable as income, pointed out:

"Whether the contract be regarded as providing additional payment for inventions to which the corporation was already entitled under the prior contract or as providing for the payment for inventions to which its rights had not as yet been perfected, there can be no question but that the royalties were to be paid in consideration of the transfer of the inventions and the patents covering them, and not for services rendered the corporation which were covered by a separate provision of the contract.

\*     \*     \*     \*     \*

"Even if the royalties had been mere additional payments for patent right already transferred, there is no reason why they should not be treated as gains from the sale of capital assets and not as ordinary income. Payment for the transfer of a capital asset does not suffer a change of character because made after the transfer or because made in addition to a prior consideration."

In the instant case, the reason the taxpayer-inventor signed the agreement in 1945 entitling him to receive the patent royalties for only a five-year period was that his brother, Roy, another general partner, felt that his ability and experience in the sales field was of equal value to the partnership as was the patent itself. Believing that Roy's services to the partnership would be of a lifetime nature, the taxpayer-inventor finally agreed to the five-year royalty limitation. Roy Weller acted as sales manager for two years thereafter and then resigned, which, in the mind of the taxpayer-inventor, violated their agreement and caused him serious damage. When it became known in 1952 that an application for a patent reissue had to be made, the taxpayer-inventor held a meeting with the other partners and, in good faith, explained to them that his signature was required on the application and, also, that the original understanding in 1945 was breached when his brother, the sales manager, resigned after only two years with the partnership, and for these reasons he felt that he was entitled to further royalties from the patent. As a result of this meeting, Weller signed the reissue application and the partners agreed that Weller should receive a three (3) per cent royalty on future sales of the patent.

The Government contends that the reason for the five-year royalty limitation in the original agreement was not because of any understanding that the taxpayer-inventor and his brother, the sales

manager, would devote their lives to the partnership, but rather Carl Weller's belief that the use of the soldering gun would be limited to radio repair work and that the market for such a product would become stabilized after a relatively short time. We accept the taxpayer's explanation, but whether or not this contention is correct is of no significance. Adopting the language in the Reid and Ost decisions (supra), if the royalty payments in issue "represented either consideration for perfecting title or additional consideration for that to which" the partnership was "already entitled, the sums were nevertheless in consideration of the transfer of the invention and patent." Whether Weller's refusal to sign the reissue application "would have been successful is not determinative * * * (w)hat is important is that" the other partners "considered the claim meritorious enough to sign the agreement of" June 23, 1952.

Thus, I conclude that the payments received by plaintiff, Carl Weller, as a result of the June 23, 1952, agreement were royalties for the transfer of the patent and as such constituted long-term capital gains.

II. The next issue raised is whether or not capital gains treatment is allowable to the extent that the transfer of patent rights was made to a partnership of which plaintiffs were partners.

Section 1235 of the 1954 Code, 26 U.S.C.A. (Section 117(q) of the 1939 Code), which requirements must be met in order for capital gains treatment to be applicable, reads, in part, as follows:

"(a) General.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

"(1) payable periodically over a period generally cotermi-

nous with the transferee's use of the patent, or

"(2) contingent on the productivity, use, or disposition of the property transferred.

"(b) 'Holder' defined.—For purposes of this section, the term 'holder' means—

"(1) any individual whose efforts created such property, * * * "

* * * * *

"(c) Effective date.—This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred."

* * * * * *

"(d) Related persons.—Subsection (a) shall not apply to any transfer, directly or indirectly, between persons specified within any one of the paragraphs of section 267(b); except that, in applying section 267(b) and (c) for purposes of this section—"

* * * * * *

"(2) paragraph (4) of section 267 (c) shall be treated as providing that the family of an individual shall include only his spouse, ancestors, and lineal descendants. As amended Sept. 2, 1958, Pub. L. 85–866, Title I, § 54(a), 72 Stat. 1644."

Plaintiff, Carl Weller, fits within the section's definition of "holder" since he created the property transferred. He transferred to the partnership, other than by gift or devise, all substantial rights to an individual interest in a patent and payments for the transfer were received by him in the years 1955, 1956 and 1957, all of which are covered under the 1954 Code.

Prior to the enactment of the 1954 Code there was confusion regarding the characterization of income received as a

result of a partner's dealing with the partnership. One point of view held that a partner dealing with his partnership is considered to be dealing with himself to the extent of his interest in the partnership. This was known as the aggregate approach, i. e., the partnership is no more than the aggregate of the individual partners. Another point of view was the so-called entity approach, i. e., a partner in dealing with his partnership is considered to be dealing with the partnership as a separate and distinct entity. In the 1954 Code, Congress expressly adopted the "entity" approach.[2]

It is the plaintiffs' position that the transfer of patent rights in 1952 to the partnership must be treated, under Section 707(a), of the 1954 Code, 26 U.S. C.A., as a separate entity from the partners of which it is composed and, therefore, the partnership does not come within the prohibited class of transferees set forth in Section 1235(d) of the Code.

The Government, on the other hand, argues that Section 707(a) does not apply in this case because the transfer occurred prior to the effective date of Section 707, which was the partnership taxable year beginning after December 31, 1954. See 26 U.S.C.A. § 771(a). For this reason, it contends that the transfer of patent rights in 1952 to the partnership must be considered as a sale to the individual partners and since the plaintiffs each owned 22.45% interest in the partnership, then 44.90% of the transfer cannot be considered a sale or exchange of a capital asset because of the restriction contained in Section 117(q) of the 1939 Code, which section was also included in the 1954 Code under Section 1235.

In this Circuit, the Court of Appeals in Randolph Products Co. v. Manning, 176 F.2d 190 (3d Cir. 1949), held, under the 1939 Internal Revenue Code, that a partnership is not separate from its partners and does not own property as an entity distinct from its partners. Since the enactment of the 1954 Code, however, no cases were found in the Third Circuit which decided the application of Section 707(a) to payments received subsequent to 1954 as a result of a partnership agreement entered into before that date. But in the recent case of Zola Klein, 42 T.C. 1000 (1964), the Tax Court held that proceeds from an installment sale received in years when the 1954 Code was in effect would be governed by that Code rather than the 1939 Code, which was in effect when the sale transaction took place. The Court noted that the installment sale section is elective and that the taxpayer could have accounted for his entire profit at the time of the sale. His failure to do so resulted in what was long-term capital gain income under the 1939 Code being taxed as ordinary income under the 1954 Code. Also enlightening is the case of Hitchcock v. Frank (D.C.Wash.1963) 11 A.F.T.R.2d 1703, in which proceeds of a contract for the cutting of timber executed in October, 1952, between the taxpayer and his controlled partnership were received in 1953, 1954 and 1955. The Court there indicated that Section 707 of the 1954 Code would govern the 1955 receipts, except for the fact that that section did not by its terms apply to the facts of the case because the transaction did not constitute a "sale or exchange" of property within the meaning of that section.

It is my conclusion, based upon these recent cases, that the gains realized by the plaintiffs subsequent to the enactment of the 1954 Code should be governed by it. The plaintiff-inventor entered an agreement in 1952 with the partnership whereby he would receive 3% royalties on future sales of the soldering gun. If he had agreed to receive a lump sum at that time rather than to yearly percentage payments for the remaining life of the patent, then there would be no

---

2. Section 707(a)—"If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner."

question but that the amount received would be controlled by the 1939 Code. Here, however, the taxpayer received payments as a result of the 1952 sale of patent rights in the years 1955, 1956 and 1957. The payments in those years should be governed by the 1954 Code and Section 707(a) of that Code provides that when a partner engages in a transaction with the partnership, the transaction should be considered as occurring between the partnership and one who is not a partner. Therefore, the payments received by Carl and Emily Weller since the enactment of the 1954 Code should be treated as capital gains under Section 1235 (supra).

III. The next issue is whether or not the income from the successful litigation of a patent infringement suit should be allocated between the trusts and the taxpayers. The taxpayers argue that the proceeds of the patent infringement litigation paid to the donee-trustee should be taxed to the respective trusts which received said proceeds and not to themselves, the donors, who had transferred certain interests in the partnership to the trusts more than a year before the proceeds were realized, the transfer taking place at a time when the right to such proceeds was in litigation so that it was not known if there would be any recovery or when such recovery would take place.

The Government maintains that the patent income represented by the patent infringement award represents income earned during the period of infringement, i. e., October 4, 1951, through April 30, 1956, inclusive, and "that that portion of the patent infringement income which was earned prior to the time that Carl and Emily Weller assigned interests in the partnership in trust should be taxed to Carl and Emily Weller inasmuch as it was their interest in the patent as represented by their interest in the partnership which was infringed upon during this period."

In support of their position the Government relies, among others, on the United States Supreme Court decision of Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. In that case the taxpayer assigned to his wife the right to receive his salary. In holding that the salary was properly taxed to the husband even though received by the wife, Mr. Justice Holmes, speaking for the Court, stated:

"There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they [grow]."

The same reasoning was reiterated by the Supreme Court in the later case of Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, cited by the Government. However, in that case the Court notes the difference between cases like Horst and Lucas and the case of Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465, where the distinction was made between a gift of income derived from an obligation to pay compensation and a gift of the income-producing property itself. The Court, in Horst (supra), referring to the Blair case, stated:

"In the circumstances of that case the right to income from the trust property was thought to be so identified with the equitable ownership of the property from which alone the beneficiary derived his right to receive the income and his power to command disposition of it that a gift of the income by the beneficiary became effective only as a gift of his ownership of the property producing it. Since the gift was deemed to be a gift of the property the income from it was held to be the income

of the owner of the property, who was the donee, not the donor, a refinement which was unnecessary if respondent's contention here is right, but one clearly inapplicable to gifts of interest or wages. Unlike income thus derived from an obligation to pay interest or compensation, the income of the trust was regarded as no more the income of the donor than would be the rent from a lease or a crop raised on a farm after the leasehold or the farm had been given away.'"

The taxpayers, acknowledging the correctness of the Lucas and Horst decisions, but making note of the distinction drawn in the Blair case (supra), cite the case of Cold Metal Process Co. v. Commissioner, 247 F.2d 864 (6th Cir. 1957), whose fact pattern is similar to the instant case. In that case the taxpayer, a corporation, was the plaintiff in patent infringement litigation. All of its assets, including the rights in the infringement suit, were transferred to a trustee for the stockholders in liquidation of the corporation. Eventually the litigation was resolved in favor of the plaintiff-corporation and the trustee received payment of the damages awarded. The Government there sought to tax the corporation for the infringement income, but the Court of Appeals held that the case was not the type of case under consideration in Lucas v. Earl (supra) and Helvering v. Horst (supra), and other similar cases. The Court stated:

"Regardless of the terminology used with respect to the income, its taxability depends upon the actual circumstances existing at the time of the transfer. At that time, it was not income to Cold Metal. It was an unliquidated chose in action. Cold Metal divested itself of all title, interest and control over it at that time. Later developments over which Cold Metal had no control transformed it into taxable income which was paid to and received by the new owner for its sole use and benefit. These facts fall far short

of classifying the transaction as an anticipatory assignment of income taxable to the assignor when later paid. In Harrison v. Schaffner, supra, 312 U.S. 579, at pages 580 and 582, 61 S.Ct. 759 [85 L.Ed. 1055], the Supreme Court stated that the rule applicable to an anticipatory assignment of income applies when the assignor is entitled at the time of the assignment to receive the income at a future date and is vested with such a right. Cold Metal's right was not a vested right in 1945. We think that the absolute and unconditional assignment by it in 1945 of the income producing property together with a contingent right to income therefrom, payable, if at all, at some indefinite time in the future in an indeterminate amount, with respect to which the assignor had no voice or control whatsoever, prevents us from treating the case as one involving the anticipatory assignment of income, which when paid becomes taxable to the assignor."

The holding in the Cold Metal case was followed in the more recent case of Jones v. Commissioner, 306 F.2d 292 (5th Cir. 1962), reversing an earlier decision by the Tax Court, 25 T.C. 1100. The Court of Appeals held that a stockholder who assigned to the corporation his interest in an "uncertain, doubtful and contingent" claim was not responsible for the payment of tax on the amount finally recovered. In Wood Harmon Corp. v. United States, 311 F.2d 918 (2d Cir. 1963), the Court cites with approval the case of Cold Metal Process (supra), but finds it clearly distinguishable from the case before it.

■ I am of the opinion that the decisions in Cold Metal Process and Jones (supra) are applicable to the present case. Here, the taxpayers, Carl and Emily Weller, transferred partnership interests in Weller Manufacturing Company to Trustees of validly established trusts, consisting of income-producing property, including the unliquidated chose in action, i. e., a patent infringe-

ment suit still pending, the recovery of which was uncertain at the time of transfer. Hence, the taxpayer-donors had divested themselves of all ownership in the litigation and the award subsequently recovered is the property of the Trustees. Therefore, no allocation between the trusts and the taxpayers is necessary.

IV. The final issue is whether or not $3,000.00 is a reasonable salary to attribute to plaintiff, Carl E. Weller, from the partnership of Weller Manufacturing Company for services rendered during the year 1957.

For the fiscal year ending April 30, 1957, the partnership of Weller Manufacturing Company paid Carl Weller no salary for whatever services he rendered the partnership during that year. Section 704(e) (2) provides that:

"In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor."

■ In this instance there was a gift of a partnership interest in trust for the benefit of the plaintiff's children. He drew no salary from the partnership, although it is admitted that the plaintiff spent some time on partnership activities. Therefore, his situation comes under Section 704(e) (2) of the Code and a reasonable salary must be determined for the services he rendered to the partnership for the fiscal year of 1957.

It is the plaintiffs' contention that because Carl Weller spent "less than one-fifth of his time during the year on partnership activities" a reasonable salary would be $3,000.00, since his top salary was $7,200.00 for the years 1950, 1951 and 1952, when he was in full charge of the partnership. Since 1952 a general manager was hired to handle the work previously done by Mr. Weller.

The Government maintains that $12,-000.00 would be a reasonable salary "in light of the increase in sales and Carl E. Weller's service to the partnership directly and indirectly through his service to the sales company (from which he drew no salary)."

The criteria for determining a reasonable salary as laid down in the Regulations, Section 1.704-1(e) (3) (i) (c), read as follows:

"In determining a reasonable allowance for services rendered by the partners, consideration shall be given to all the facts and circumstances of the business, including the fact that some of the partners may have greater managerial responsibility than others. There shall also be considered the amount that would ordinarily be paid in order to obtain comparable services from a person not having an interest in the partnership."

■ Applying the above-cited Regulation to the present case, noting that there was a substantial increase in the business of the Weller Manufacturing Company, and the fact that Carl Weller spent over half of his time at the manufacturing plant, as well as the testimony of Weller which would justify the conclusion that he had "greater managerial responsibility" than the other partners, and taking into consideration, as a mitigating circumstance, the fact that a general manager was hired from outside the partnership and served during 1957, it is my opinion that $10,000.00 would be a reasonable salary allowance for his services.

This opinion shall constitute findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

For the reasons set forth above, judgment will be entered in favor of the plaintiffs and against the defendant. The parties are directed to prepare an appropriate order.