GERALD A. HEGGESTAD AND CHERYL L. HEGGESTAD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18265-84.          Filed October 17, 1988.

*James Benham,* for the petitioners.
*Martha J. Combellick,* for the respondent.

HAMBLEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1979 and 1980, in the respective amounts of $140,005 and $56,815.

The issues for decision are:

(1) Whether $85,360 of losses incurred by petitioner Gerald A. Heggestad in 1980 in selling certain Treasury bill futures contracts were capital losses rather than ordinary losses; and

(2) Whether petitioner Gerald A. Heggestad's distributive share of partnership income from his commodities brokerage firm includes commissions he paid to the firm on trades for his personal account.

### FINDINGS OF FACT

At the time they filed their petition herein, petitioners Gerald A. and Cheryl L. Heggestad resided in Scottsdale, Arizona. Petitioners filed joint individual income tax returns for 1979 and 1980 with the Internal Revenue Service Center, Kansas City, Missouri.

### *Cross Country Commodities*

During the times pertinent to this case, petitioner Gerald A. Heggestad (Heggestad) was a general partner in Cross Country Commodities, a commodities brokerage firm. Heggestad had two other partners in Cross Country Commodities. All three partners at that time resided in the Sioux City, Nebraska, area.

Heggestad was a registered commodities futures representative. Heggestad and his two partners decided to form Cross Country Commodities because they believed it would be more cost-effective for the three to share the expense of maintaining and operating a single office.

Cross Country Commodities was formed on October 1, 1978. Its stated business purpose was to engage in the brokerage of commodities futures as an associate brokerage firm in Sioux City, Nebraska. As an associate brokerage firm, the partnership would receive orders from customers to buy and sell various commodities futures contracts. However, the partnership would not be a member of the Chicago Board of Trade; it thus could not directly purchase

or sell commodities futures contracts on the exchange. Instead, as an associate broker, the partnership would have other brokerage firms, who were members of the Chicago exchange, actually purchase and sell the futures contracts. Cross Country Commodities would receive a commission from the customer for this service in effectuating the customer's transaction. It would pay 40 percent of the commission to the member brokerage firm through which the transaction was executed and retain the remaining 60 percent.

For its fiscal year ending September 30, 1979, Cross Country Commodities received and retained $1,776,158 of commissions from brokering purchases and sales of commodities futures. For its last fiscal year covering the period October 1, 1979, through April 7, 1980, the partnership received and retained $614,166 of commissions.

Pursuant to conducting its brokerage business, the partnership maintained a "house account." Losses on customer accounts which were to be absorbed by the partnership were posted to this account. For example, the partnership would absorb the loss on a transaction where its employee had the customer's order executed incorrectly.

The partnership's net income was shared equally by its three partners. Each partner's share of annual net profits was to be distributed to him; his share of any net losses was chargeable against his capital account.

The partnership agreement specifically recognized that each partner would engage in other businesses and activities for his personal account. The partners were not required to devote their entire time to the partnership's brokerage business. The partnership agreement further allowed any partner to withdraw from the firm upon his giving 60-days written notice to the other partners.

One of Heggestad's partners withdrew from Cross Country Commodities in late 1979 or early 1980. Heggestad and the other partner subsequently decided to terminate their partnership in mid-March of 1980. The firm's business was terminated by April 7, 1980.

## Heggestad's Purchases and Sales of Commodities Futures

Heggestad, in addition to the brokerage business of Cross Country Commodities, invested in commodities futures for his personal account. In investing for his own account, he made numerous purchases and sales of futures contracts on a number of different accounts.

These various accounts were held by him either as sole owner or in partnership with other individuals. In connection with trades for these accounts, Heggestad paid his commodities brokerage firm Cross Country Commodities commissions totaling $215,701 in 1979 and $34,877 in 1980. Cross Country Commodities retained 60 percent of the commissions paid by Heggestad; the other 40 percent was paid to the member brokerage firms which executed the trades.

In 1979 and 1980, Heggestad incurred substantial losses from his commodities futures trading. In 1979, he had losses totaling $231,685; in 1980 he had losses totaling $129,544. The financial losses he suffered caused him to discontinue his activities with respect to commodities futures.

Of the $129,544 of losses in 1980, $52,495 were from Heggestad's sale of six Treasury bill futures contracts on March 3, 1980, and March 4, 1980. These particular futures contracts had originally been purchased through other accounts. Each futures contract was transferred on March 3 or March 4, 1980, to an individual account of Heggestad's prior to its sale. The futures contract, the account from which it was transferred, and the amount of loss on its sale, are as follows:

| Futures contract | Name and number of account from which transferred | Amount of loss on sale |
| --- | --- | --- |
| One March 1980 Treasury bill | Eugene Heggestad, #92-92512 | ($10,920) |
| One March 1980 Treasury bill | Bryan & Deis, #92-92616 | (10,920) |
| One March 1980 Treasury bill | J.A. Tremonti, Inc., #92-92493 | (10,945) |
| One March 1980 Treasury bill | J.A. Tremonti, Inc., #92-92403 | (10,945) |
| One June 1980 Treasury bill | Dale H. Meyer, #92-92346 | (1,795) |
| One June 1980 Treasury bill | Buestad Trading Co., #92-92555 | (6,970) |

Heggestad held a 50-percent ownership interest in the Buestad Trading Co. account. As to the other accounts

listed, other than for the Dale H. Meyer account, they were owned by persons with whom Heggestad in 1979 and 1980 had held joint investment accounts. Eugene Heggestad is Heggestad's brother. Wilson Bryan and Jack Tremonti, in 1979 and 1980, were also investment partners of Heggestad's on certain other accounts.

Another $32,865 portion of Heggestad's $129,544 1980 loss, relates to seven June 1980 Treasury bill futures contracts which he had purchased on February 14, 1980. These seven Treasury bill contracts were part of a larger purchase which Heggestad made that day through one of his solely owned personal accounts. On March 3, 1980, he incurred a $32,865 loss in selling the seven contracts.

### Cross Country Commodities Returns and Petitioners' Individual Returns

Cross Country Commodities on its partnership return for its fiscal year ending September 30, 1979, reported receiving $1,776,158 of commissions from commodities futures contracts transactions. The partnership also claimed as its cost of operations $362,698 for losses incurred on its house account. After including $519 of interest income, and taking into account a $365 loss incurred in selling an automobile used in the partnership's business, deductions for salaries and wages, rent, taxes, depreciation, and other expenses, the partnership reported having $1,092,362 of ordinary income for the fiscal year. A Schedule K-1—Partner's Share of Income, Credits, Deductions, etc.-1978—showed Heggestad's share of the ordinary income to be $364,120. Heggestad on the Schedule K-1 was stated to have a 33.333334-percent interest in the partnership's profits, losses, and capital.

Cross Country Commodities on its partnership return for its last fiscal year covering the period October 1, 1979, through April 7, 1980, reported receiving $614,166 of commissions from commodities futures contracts transactions. The partnership claimed as its cost of operations $89,025 for losses incurred on its house account. After including $1,211 of interest income, and taking deductions for salaries and wages, rent, taxes, bad debts, repairs, depreciation, and other expenses, the partnership reported

having $376,447 of ordinary income for its last fiscal year. The Schedules K-1 for Heggestad and the partner who remained until the firm's termination showed each had a $127,050 share of ordinary income; the Schedule K-1 for the partner who withdrew from the firm showed his share of ordinary income was $122,347.

Cross Country Commodities' partnership returns were prepared by the Chicago, Illinois, office of a Big Eight accounting firm.

Petitioners, on their joint individual income tax return for 1979, reported $364,120 of ordinary income as Heggestad's distributive share of partnership income from Cross Country Commodities for its fiscal year ending September 30, 1979. The $364,120 was shown on a Schedule E—Supplemental Income Schedule (from pensions and annuities, rents and royalties, partnerships, estates and trusts, etc.), attached to petitioners' return. On a Schedule C—Profit or (Loss) From Business or Profession, attached to their return, petitioners showed a $278,429 loss from Heggestad's activity as a "commodities dealer." The Schedule C stated that closing inventory was valued at the lower of cost or market. The parties have subsequently stipulated that the correct amount of the loss for 1979 is $231,685, rather than the $278,429 claimed on the return.

Petitioners, on their joint individual income tax return for 1980, reported $127,050 of ordinary income as Heggestad's distributive share of partnership income from Cross Country Commodities for its last fiscal year covering the period October 1, 1979, through April 7, 1980. The $127,050 was shown on a Schedule E attached to petitioners' return. On a Schedule C attached to their return, petitioners showed a $129,554 loss from Heggestad's activity as a "commodities dealer." The Schedule C stated that closing inventory was valued at the lower of cost or market. The $85,360 of losses incurred by Heggestad on Treasury bill futures contracts— the characterization of which is in issue—are part of this $129,554 of loss claimed.

## Respondent's Notice of Deficiency

Respondent, in his notice of deficiency to petitioners, disallowed the deductions taken for the 1979 and 1980

Schedule C losses. Respondent determined the losses could not be recognized because the transactions were entered into for tax-avoidance purposes or lacked economic substance or because petitioners had not established the losses were incurred in the manner claimed. Respondent alternatively determined that if any portion of the claimed losses were bona fide and otherwise allowable, such losses were capital in character. Respondent, in the notice, further determined that petitioners were liable for $2,097.90 of self-employment tax for 1980.

The parties have now stipulated that the correct amount of loss for 1979 is $231,685, rather than the $278,429 claimed. Respondent has conceded the losses incurred in 1979 and 1980 were bona fide and otherwise allowable. Petitioners have conceded that, with the exception of the $85,360 of losses in 1980 on Treasury bill futures contracts, the losses incurred in 1979 and 1980 were capital losses.

## OPINION

At issue is the character of $85,360 of losses incurred by Heggestad in 1980 as either ordinary or capital losses and whether Heggestad's distributive share of partnership income from his brokerage firm includes commissions he paid to the firm. Respondent's determinations in his notice of deficiency are generally presumed correct. Petitioners bear the burden of proof and must establish such determinations to be erroneous. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

### 1980 Losses on Treasury Bill Futures Contracts

Petitioners contend the $85,360 of losses incurred on Treasury bill futures contracts which Heggestad sold in March 1980 were ordinary losses and not capital losses. Respondent disputes that the losses were ordinary losses. In claiming that the losses were ordinary losses, petitioners make no contention that these futures contracts qualify under any of the statutory exclusions listed in section 1221[1] of properties which are not capital assets. They do not

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as applicable and in effect for the taxable years in issue. Sec. 1221 provides in part as follows:

assert that the futures contracts sold were inventory or property held for resale in the ordinary course of business to customers under section 1221(1), nor do they argue that the Treasury bill futures contracts are excluded from being capital assets by section 1221(5).[2] Rather, they predicate their entitlement to ordinary loss treatment solely on coming within the judicial doctrine enunciated in *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955).

Accordingly, the Treasury bill futures contracts will be capital assets, and the losses incurred in their sale will be capital, rather than ordinary, losses, unless the *Corn Products* doctrine is applicable. In *Corn Products Refining Co. v. Commissioner, supra,* the taxpayer was engaged in the manufacture of corn products. It purchased corn futures in order to insure a stable price for the raw product by eliminating price fluctuations caused by occasional supply shortages on the market. Its gains and losses were held to be ordinary because the property it was using as a hedge—corn—was an integral part of its business. Its trades in corn futures were thus taxed in the same manner as the corn it held as inventory. The Supreme Court's focus in *Corn*

---

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, * * *

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property * * *

(5) an obligation of the United States or any of its possessions, or of a State or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue; or

(6) a publication of the United States Government (including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, * * *

[2]Contrary to the position they originally took on their tax returns, petitioners now acknowledge Heggestad was not a "dealer" in commodities futures. His activities in purchasing and selling futures contracts for his personal account were those of an investor or trader, not those of a merchant. *Adnee v. Commissioner,* 41 T.C 40, 43 (1963); *Kemon v. Commissioner,* 16 T.C. 1026, 1032-1033 (1951); *Kozikowski v. Commissioner,* T.C. Memo. 1986-364. Additionally, in *Moody v. Commissioner,* T.C. Memo. 1985-20, this Court rejected a taxpayer's contention that Treasury bill futures contracts were excluded from being capital assets under sec. 1221(5).

*Products* was on the purpose for which the futures were held—as hedges.

While the Supreme Court's decision dealt specifically with hedging transactions designed to protect the taxpayer's inventory supplies, the cases subsequently decided applied the *Corn Products* doctrine to exclude from capital asset treatment those assets purchased as a "necessary and integral part of the taxpayer's business." *Campbell Taggart, Inc. v. United States,* 744 F.2d 442 (5th Cir. 1984); *Hoover Co. v. Commissioner,* 72 T.C. 206, 237 (1979). In *Booth Newspapers, Inc. v. United States,* 303 F.2d 916, 921 (Ct. Cl. 1962), the Court of Claims stated the following test for applying the doctrine:

if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as * * * [a]n ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

Similarly, in *Hoover Co. v. Commissioner, supra,* we observed that:

The touchstone of the *Corn Products* doctrine is that seemingly capital property transactions are entitled to ordinary treatment only when the transactions are an integral part of the taxpayer's day-to-day business operations or are necessary to protect or generate ordinary operating income * * * [72 T.C. at 237.]

It is upon this caselaw exception to capital asset treatment which petitioners rely. In *W.W. Windle Co. v. Commissioner,* 65 T.C. 694, 707-709 (1976), appeal dismissed 550 F.2d 43 (5th Cir. 1977), this Court discussed the various situations in which the *Corn Products* doctrine has been applied.

Recently, however, in *Arkansas Best Corp. v. Commissioner,* 485 U.S. __ (1988), the Supreme Court rejected this broader scope given the *Corn Products* doctrine. In holding that losses on the sales of stock before it were capital rather than ordinary losses, the Supreme Court in *Arkansas Best* stated:

We conclude that *Corn Products* is properly interpreted as standing for the narrow proposition that hedging transactions that are an integral part of a business' inventory-purchase system fall within the inventory exclusion of §1221.  * * *

It is also important to note that the business-motive test advocated by [the taxpayer] is subject to the same kind of abuse [we] condemned in *Corn Products*. [We] explained in *Corn Products* that unless hedging transactions were subject to ordinary gain and loss treatment, taxpayers engaged in such transactions could "transmute ordinary income into capital gain at will."  * * *

Because the capital stock held [here] falls within the broad definition of the term "capital asset" in §1221 and is outside the classes of property excluded from capital-asset status, the loss arising from the sale of the stock is a capital loss. *Corn Products Refining Co. v. Commissioner, supra*, which we interpret as involving a broad reading of the inventory exclusion of §1221, has no application in the present context  * * *

[485 U.S. at ___.]

It is thus apparent that the wider scope previously given to the *Corn Products* doctrine has been placed in question by the recent decision of the Supreme Court in *Arkansas Best.*

We need not, however, attempt to resolve the present scope of the *Corn Products* doctrine in light of the *Arkansas Best Corp v. Commissioner, supra,* case. Petitioners bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. Even under the prior existing caselaw petitioners, on this record, have not established that they are entitled to ordinary loss treatment.

The evidence presented fails to show that the Treasury bill futures transactions in question were an integral part of Heggestad's partnership brokerage business. Heggestad essentially engaged in two activities: (1) Cross Country Commodities' associate brokerage business involving the execution of commodities futures transactions for customers from which he as a partner earned commissions income; and (2) his investing in commodities futures for his personal account.

Futures contracts were not purchased as hedges. Neither Heggestad or his partnership was involved in a business involving the consumption or marketing of the underlying commodities. In trading for his personal account, Heggestad dealt solely in futures contracts which he purchased in the hope of profiting from fluctuations in the price of the underlying commodity. He had no intention to make or

accept delivery of the commodity. See *Faroll v. Jarecki*, 231 F.2d 281 (7th Cir. 1956).

Petitioners contend the losses in question were incurred to protect the commissions income Heggestad derived from Cross Country Commodities and its associate brokerage business. Heggestad testified that he entered into the Treasury bill futures transactions in an attempt to recoup the losses which certain of his customers had suffered. According to Heggestad, when the anticipated profits failed to materialize, he personally absorbed the losses rather than charging the losses to the customers' accounts. This was done, he stated, to preserve customer goodwill and to assure himself of future brokerage business. He explained that these particular individuals in addition to having large losses had relied on him to do their trading. As a result, he felt responsible for their losses.

Heggestad admitted, however, to investing with some of these people on a joint or partnership basis. In some of these arrangements, Heggestad elaborated, he and the other individual would share the profits, but the individual would not be required to contribute any further capital beyond the initial investment. Under his arrangements with these individuals, this limitation on their losses applied both as to joint accounts held with Heggestad and accounts in which Heggestad had no interest. It thus seems some of these transactions were entered into by Heggestad for speculative purposes to reduce his own potential losses. In fact, one of the futures contracts was purchased on the Buestad Trading Co. account, an account in which Heggestad held a 50-percent interest. Another seven of the contracts were acquired on an individual account of which Heggestad was the sole owner. While the remaining five futures contracts were acquired on accounts in which Heggestad did not have an interest, in each instance, all but one of the owners were persons who had also invested extensively on a joint basis with Heggestad. One of these persons was Heggestad's brother.

In *W.W. Windle Co. v. Commissioner, supra* at 712-713, this Court held that property purchased with a substantial investment purpose is a capital asset even if there was a more substantial business purpose for the purchase. Under

this formulation of the *Corn Products* doctrine, both at the acquisition and throughout the period of the property's retention there must have been no substantial investment purpose. In adopting such test, we stressed that the *Corn Products* case, *supra*, had to be read in light of the close relation of the corn futures to the taxpayer's inventory in that case. Particularly, where a more traditional form of capital asset was involved, we believed any broader expansion of the *Corn Products* doctrine would cause only greater uncertainty and controversy. *W.W. Windle Co. v. Commissioner, supra* at 713-714.

As discussed, these transactions in issue were not inventory-related hedging transactions. On this record, petitioners have failed to show Heggestad did not have a substantial investment purpose. On the contrary, it seems Heggestad entered into these transactions for speculative purposes. He testified that when he acquired the futures contracts he thought the prices for the underlying Treasury bills would continue to rise. Any profits made would have accrued to Heggestad, either directly because the profits would ultimately have been posted to an account in which he held a joint or sole ownership interest or indirectly because the gain could be given over to a third party.[3]

---

[3]Heggestad testified as follows:

Petitioners' counsel: Why would you purchase the Treasury bills contracts in 1980?

Heggestad: Because of the [customer] accounts that I had left in 1980, had I not purchased them, for them it would have created a large debit in each account which I had already told them when they started that I wouldn't require any more money from them and this would have put their account very debit, each one of them.

Petitioners' counsel: And when their account was debit, what does that mean?

Heggestad: I'm liable for the debit. * * * Especially since I had already told them, you know, I basically did, the trading for them. It wasn't trading they were doing on their own.

Petitioners' counsel: The debit represents a loss in that customer's account.

Heggestad: Yes.

Later, in reference to the $32,865 in losses incurred on June 1980 Treasury bill future contracts purchased on his individual account, he testified:

Heggestad: * * * On this one given day, I purchased seven June T-bills which—for a couple of reasons. One, by the end of the trading day, they were already losing trade[s] again and they were—all the customers were already in margin trouble anyway and couldn't handle any—any more position, with the thought that hopefully by the time I would get out of the March [1980 Treasury bills] they'd come back and I can give these June T-bills over to them and the whole trade would wash or make some money, recoup their losses on the March, or get out of their March and transfer these over—these Junes over to them and hopefully the market would go into my position and they'd not only recoup all their losses, they'd have a shot at making good money. But it didn't subsequently happen that way and I had to—when I liquidated myself out of the market and the customers, because I was done with the business, that amount on those seven bills were lost.

Petitioners have thus failed to establish the lack of a substantial investment purpose on the futures contracts acquired. Eight of the futures contracts were purchased on accounts in which Heggestad held an interest. As to the remaining five futures contracts purchased on the other accounts, Heggestad nevertheless had an investment purpose. There was a great deal of flexibility, insofar as trading positions were transferred from Heggestad's personal accounts to certain customer accounts. Heggestad testified that where he had acquired a number of profitable positions, he would on occasion give some of the contracts to his customers. In our view, the fact that five of the Treasury bill futures contracts were initially purchased on customer accounts, does not vitiate Heggestad's investment purpose. Heggestad, in 1980, was trying to recoup his own losses, as well as those of certain customers for whom he traded. Under his investment arrangements with these customers, if unsuccessful he would have to bear the further losses. These customer accounts had or were soon to go debit. Heggestad would be personally liable for the debits. He, however, continued to chase the market in the hope of avoiding, or at least reducing, the loss he would otherwise suffer. Further, strong personal reasons also existed for Heggestad to enter into the transactions. One of the accounts was owned by Heggestad's brother. The other accounts were those of individuals with whom Heggestad in the past had invested extensively on a joint or partnership basis.

Moreover, we are not satisfied that a substantial business purpose relating to the conduct of the partnership's brokerage business, much less any business purpose relating to his future brokerage activities, motivated Heggestad to enter into the transactions. Cross Country Commodities did have a house account for absorbing losses to be borne by the partnership. Heggestad, in his testimony, never fully elaborated on why the losses were not treated as a partnership expense.[4] From his failure to do so, we infer his partners

---

[4]Where the account belonged to a regular customer of Heggestad's, the partnership apparently expected Heggestad to take adequate precautions to secure the partnership against any loss on the account. Heggestad would thus be charged for any debit in the account of a regular customer of his. Heggestad testified that, in contrast, where a debit went unpaid

would not have permitted the losses to be charged to the partnership. In other words, they would have deemed the transactions as unrelated and not necessary to the conduct of Cross Country Commodities' brokerage business. Lastly, while petitioners contend the transactions were undertaken to protect Heggestad's future commissions income, he, about the time the futures contracts were sold, had decided to cease all his activities pertaining to commodities futures and retire. He testified that because of the large losses he suffered in trading for his own account, he was "broke."

In conclusion, petitioners even under the prior existing caselaw would not be entitled to ordinary loss treatment under the *Corn Products* doctrine. We, therefore, hold the 1980 losses incurred by Heggestad on the Treasury bill transactions were capital, and not ordinary, losses.

### *Heggestad's Distributive Share of Partnership Income*

Petitioners contend Heggestad's 1979 and 1980 distributive share of partnership income from Cross Country Commodities should not include the commissions he paid to the partnership. In making this argument, petitioners cite *Benjamin v. Hoey*, 139 F.2d 945 (2d Cir. 1944), a case decided under the 1939 Code. Respondent, in response, notes that with the enactment of section 707(a) Congress has expressly rejected the aggregate view of transactions between a partner and his partnership adopted in *Benjamin v. Hoey*.

Section 707(a) generally provides that where a partner engages in a transaction with his partnership other than in his capacity as a member of the partnership, the transaction shall be viewed as occurring between the partnership and one who is not a partner. Section 1.707-1(a), Income Tax Regs., states that such transactions include transactions where the partnership renders services to the partner.

The difference between the entity theory of present section 707(a) and the prior aggregate theory adopted in cases such as *Benjamin v. Hoey, supra,*[5] was succinctly

---

against the account of a new customer, such loss would be charged to the partnership's house account.

[5]In *Benjamin v. Hoey*, 139 F.2d 945 (2d Cir. 1944), the Court of Appeals relied on the contrary aggregate approach, in concluding that 38 percent of the commissions the

summarized in *Weller v. Brownwell,* 240 F. Supp. 201, 208-209 (M.D. Pa. 1965), as follows:

Prior to the enactment of the 1954 Code there was confusion regarding the characterization of income received as a result of a partner's dealing with the partnership. One point of view held that a partner dealing with his partnership is considered to be dealing with himself to the extent of his interest in the partnership. This was known as the aggregate approach, i.e., the partnership is no more than the aggregate of the individual partners. Another point of view was the so-called entity approach, i.e., a partner in dealing with his partnership is considered to be dealing with the partnership as a separate and distinct entity. In the 1954 Code, Congress expressly adopted the "entity" approach. [Fn. ref. omitted.]

In section 707(a), Congress has now mandated an entity approach be applied to certain specific partner-partnership transactions. *Pratt v. Commissioner,* 550 F.2d 1023, 1026 (5th Cir. 1977), affg. in part, and revg. and remanding in part 64 T.C. 203 (1975).

In *Kobernat v. Commissioner,* T.C. Memo. 1972-132, a stock brokerage partnership paid commissions to the taxpayer for purchases and sales of securities made with respect to the taxpayer's and the taxpayer's wife's personal accounts. While the taxpayer was a partner, he also worked for the firm as a commission salesman. The firm paid him commissions on the transactions the same as he would have received on comparable orders placed through him by any other customers. In *Kobernat,* we distinguished *Benjamin v. Hoey, supra,* stating that no partnership distribution was involved; that the taxpayer as far as the commissions paid should be considered to have the status of an employee. As a result, we did not have to address the validity of *Benjamin v. Hoey,* in light of section 707(a). We, accord-

---

taxpayer-partner paid to his brokerage partnership was not taxable income. The Second Circuit reasoned:

"The argument that it is not [income] runs thus: * * * If, without partners, he had conducted the brokerage business, he would have paid the entire amount of those commissions to himself and no one would then have thought of saying that these payments constituted part of his taxble income. Because he had partners, he paid out an amount equal to 62% of the commissions. The balance, 38%, or $25,439.91, always remained his. To put it differently, that sum he paid to himself, and what one pays to one's self cannot be part of one's income. Nothing in any statute or decisions relating to a partner's income leads to a different conclusion * * * [139 F.2d at 946.][1]"

"[1]*Neuberger v. Commissioner,* 311 U.S. 83, 61 S. Ct. 97, 85 L. Ed. 58, while not directly in point, serves to show that, generally speaking a partnership is not to be regarded as a distinct entity for tax purposes."

ingly, held the commissions were income to the taxpayer under section 61. Based on other past decisions cited therein, we noted that the taxpayer was being paid not for rendering services to himself, but for having brought business—that of his and his wife's—to the firm.

In the instant case, with section 707(a)'s enactment, *Benjamin v. Hoey, supra,* cited by petitioners, is no longer valid precedent. Section 707(a) requires the use of an entity approach where a partner engages in a transaction with his partnership other than in his capacity as a partner.

On this record, it is clear that in engaging in commodities futures trading for his own account, Heggestad was not acting in his capacity as a partner. He paid commissions to Cross Country Commodities as would have any other customer for whom the partnership had performed broker- age services. In fact, Cross Country Commodities on its 1979 and 1980 returns fully included the commissions Heggestad paid in computing each partner's share of the partnership's net income. The partnership did not differenti- ate between commissions received from Heggestad and those received from third parties.[6] We hold that Heg- gestad's distributive share of partnership income for 1979 and 1980 includes the commissions he paid to Cross Coun- try Commodities. Sec. 707(a); sec. 1.707-1(a), Income Tax Regs.

*Decision will be entered under Rule 155.*

---

[6]Heggestad in his testimony claimed that under the partnership agreement he was to receive back all commissions he paid. He admitted, however, that the written partnership agreement did not so provide and that such course of action was not reflected in the partnership's tax returns. Petitioners' contention in this regard is thus not supported by the record. Moreover, we would note that logically the partnership would not treat commissions paid on trades for a partner's personal account any differently. The partnership, after all, had to remit 40 percent of the commissions to the member brokerage firm which actually bought or sold the futures contracts on the Chicago exchange.