ARTHUR E. AND NELLIE L. SHOTTS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shotts v. Commissioner
Docket No. 22924-88
United States Tax Court
T.C. Memo 1990-641; 1990 Tax Ct. Memo LEXIS 716; 60 T.C.M. (CCH) 1480; T.C.M. (RIA) 90641; December 20, 1990, Filed *716 Decision will be entered for the petitioner. Charles N. Woodward, for the petitioners. Juandell D. Glass and Bruce K. Meneely, for the respondent. COLVIN, Judge. COLVIN
*2120 MEMORANDUM FINDINGS OF FACT AND OPINION The sole issue for decision is whether certain amounts received by *717 petitioner from Barnes Brokerage Co., Inc. (Barnes Brokerage), in 1983 were commission income. References to petitioner in the singular are to Arthur E. Shotts. Respondent determined a deficiency for petitioners for taxable year 1983 in the amount of $ 43,622.94. No additions to tax were determined. Petitioner was a commodities broker on his own behalf and for partnerships of which he was a 50-percent partner. He used the offices of Barnes Brokerage to conduct his commodities activities. Petitioner paid Barnes Brokerage a negotiated fee for the opportunity to conduct the trading through Barnes Brokerage. However, petitioner paid to Barnes Brokerage an amount in excess of the negotiated fee to provide funds to meet petitioner's margin requirements, and to pay estimated income tax and insurance premiums. Excess amounts not so used were returned to petitioner by Barnes Brokerage. The issue for decision is whether these excess *2121 amounts returned to petitioner are commission income to petitioner, as respondent contends, or commission reductions, as petitioner contends. As discussed below, we conclude they are commission reductions. Unless otherwise stated, all statutory references *718 are to the Internal Revenue Code in effect in the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT 1. Petitioners
Petitioners are married individuals who resided in Weatherford, Oklahoma, when the petition was filed. They timely filed their 1983 Federal income tax return using the cash method of accounting, except as required by section 1256. In 1983, petitioner was a licensed commodities broker. He did not hold a seat on the Chicago Mercantile Exchange or any other exchange or board of trade in 1983. One must hold a seat on the Chicago Mercantile Exchange or another exchange or board of trade to conduct trades on that exchange or board of trade. During 1983, petitioner maintained an office at First National Bank Building, Weatherford, Oklahoma. His commodity trades during 1983 were cleared through Barnes Brokerage, which held a seat on the Chicago Mercantile Exchange. Petitioners were not dealers in commodities or commodity futures. During 1983 they did not purchase or hold commodities in inventory for sale to customers in the ordinary course of business, and they did not purchase commodities *719 as hedges. 2. Petitioner's Activities with Barnes Brokerage
Mr. Bill Barnes (Barnes), chairman of Barnes Brokerage, has been acquainted with petitioner since 1957 or 1958. Petitioner began placing trades through Barnes Brokerage in 1960 or 1961. He began strictly as a customer of Barnes Brokerage. In about 1965, Barnes encouraged petitioner to obtain his brokerage license and begin commodities brokerage through Barnes Brokerage on behalf of customers. Petitioner continued to work as a broker on behalf of customers until the late 1970's when he dropped his customer business, ceased brokerage activity on behalf of others, and began solely to broker his own accounts, or accounts which he directly controlled. During 1983, petitioner brokered four different accounts at Barnes Brokerage: (1) his individual account; (2) his wife's individual account; (3) the partnership account of Shotts & Hargrove; and (4) the partnership account of Shotts & Wheeler. Petitioner had direct control over each of these accounts. Shotts & Hargrove was a horse-breeding partnership in which petitioner owned a one-half interest. Shotts & Wheeler was an oil and gas partnership in which petitioner *720 owned a one-half interest. Petitioner received no compensation from the partnerships for placing the trades on these accounts. Petitioner made all the trading decisions for these accounts, with the other partners in many instances not even knowing that a trade had been made until the profit or loss was reported by petitioner. After petitioner began brokering solely on his own account, Barnes Brokerage did not hold petitioner out to the public as an employee. Barnes Brokerage did not provide an office for petitioner, set petitioner's business hours, furnish office supplies or clerical support to petitioner, or pay petitioner's overhead expenses. However, petitioner's relationship with Barnes Brokerage was unique to that firm in that petitioner's brokerage activity was entirely for his own account. Petitioner was considered to be an independent business person rather than an employee at Barnes Brokerage. In contrast, Barnes Brokerage has other brokers who are considered to be employees. During the early 1980's, there was a change in commodity brokerage rules which allowed both customers and brokers to negotiate the rates which they were charged on a trade. In 1983 there was *721 no restriction under State or Federal law on the amount of commission to be paid to a commodity futures broker and the commission, whether in a fixed amount or percentage, was negotiable between the brokerage firm and the individual broker. Because of the change in the brokerage rules, several other brokerage companies approached petitioner in the early 1980's and offered to clear his trades for a net fee. As a result of these offers, petitioner approached Barnes to negotiate a new agreement whereby petitioner could clear his trades through Barnes Brokerage at a lower net fee. Petitioner and Barnes Brokerage orally agreed that petitioner's trades would be cleared with Barnes Brokerage at a net fee of $ 30 per trade. All agreements between Barnes Brokerage and its brokers are oral. After making this oral agreement, petitioner approached Barnes to request that the agreement be revised whereby petitioner would pay an amount to Barnes Brokerage of $ 50 or $ 60, which is in excess of the $ 30 net trading fee. The excess amount was to be used for petitioner's benefit to pay margin calls, estimated tax payments, and insurance premiums. Petitioner *2122 regarded this fund as a type of savings *722 account to pay these items. Barnes Brokerage considered the account to be a customer's trading account. 3. Barnes Brokerage's Records
Petitioner's relationship with Barnes Brokerage was unique in light of the special agreement. The Comptroller for Barnes Brokerage found that it would be most convenient to use their individual payroll accounts to account for petitioner's excess funds. Although he used payroll accounts, the Comptroller specially treated petitioner's account because it was not actually a payroll account. The amounts which were credited to petitioner's special account represented the difference between gross fees paid to Barnes Brokerage by petitioner and the net trading fee charged by Barnes Brokerage. That account was used solely at the direction of petitioner. Federal income tax withholding deductions were made from regular payroll accounts at Barnes Brokerage. However, no regular withholding deductions were made from petitioner's special account. In 1983, two distributions were made from the special account for estimated tax payments for petitioner. The first was made on March 31, 1983, in the amount of $ 15,000 and the second was made on April 30, 1983, in *723 the amount of $ 12,500. These estimated tax payments were made solely at petitioner's request. Petitioner was covered for medical/hospitalization insurance through the group medical insurance plan carried by Barnes Brokerage. The entire premium was paid by petitioner from his special account. Barnes Brokerage made no contribution for payment of petitioner's premiums. On occasion amounts were paid from petitioner's special account to petitioner's margin account. This was done as needed to meet required margin deposits. Pursuant to their agreement, Barnes Brokerage withheld amounts for petitioner's Social Security taxes from the amounts credited to petitioner's customer trading account. Barnes Brokerage paid over such amounts to the Internal Revenue Service. Consistent with the manner in which the books and records of Barnes Brokerage were kept, petitioner was issued a Form W-2 for taxable year 1983 in the amount of $ 258,611.50. This amount represents the difference between the net brokerage fees charged by Barnes Brokerage and the gross brokerage fee requested to be paid by petitioner on the accounts which he traded during taxable year 1983. However, the preprinted form *724 indicated that the amount was for wages, tips, and other compensation paid. 4. Petitioner's Tax Returns
Petitioners' Joint Individual Tax Return for taxable year 1983 was prepared by a certified public accountant, Don Britton. Line 7 of Form 1040 is for wages, salaries and tips. Consistent with the Form W-2 issued to petitioner, the $ 258,611.50 amount was initially reported on Form 1040 at line 7. However, to account for its actual character, the $ 258,611.50 amount was then subtracted from petitioners' gross income on line 21 of Form 1040 and noted "less to Form 6781." The $ 258,611.50 amount was then carried to the attached Form 6781 and shown as a reduction of the purchase price of the commodities purchased by petitioner during the year. Thus, it increased petitioners' gross income from gain on commodity sales during taxable year 1983. OPINION 1. Amounts Received by Petitioner from Barnes Brokerage
Gross income is all income from whatever source derived. Sec. 61(a). Respondent's *725 determinations as to petitioners' tax liability are presumed correct and petitioners have the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). We must decide whether certain amounts received by petitioner are taxable commission income. Respondent contends that the amounts are commission income paid to petitioner by Barnes Brokerage. Petitioner contends that the amounts are rebates of a reduction of purchase price of commodities. In essence, petitioner contends that the amounts at issue that he received are amounts paid to himself, thus not income to him. Benjamin v. Hoey, 139 F.2d 945, 946 (2d Cir. 1944). *2123 Petitioner used Barnes Brokerage's resources, but he brokered solely on his own and his wife's account and for partnerships in which he was a 50-percent partner. Petitioner and Barnes Brokerage were free to negotiate lower commissions. When he was deciding to conduct his commodities activities through Barnes Brokerage, petitioner had received offers from other brokerage firms to broker through them at a lower net commission. Thus, Barnes and petitioner negotiated a lower net commission. Respondent *726 contends that amounts returned to petitioner were wages. Respondent focuses primarily on the fact that Barnes Brokerage's records nominally treat petitioner as an employee in some respects, and that petitioner participated in Barnes Brokerage's group health plan. Respondent also points to Barnes Brokerage records that nominally treat the amount remitted to petitioner in excess of the negotiated commission as commissions paid to petitioner. Respondent's reliance on the form of these records overlooks the substance of the arrangement. It also ignores the testimony of the comptroller of Barnes Brokerage, Mr. Norman Cobb, that the records were kept this way as a simplifying convenience. We found his testimony on this point to be credible. We also found the testimony of Barnes, the chairman of Barnes Brokerage, and petitioner to be credible. We believe that their description of the facts surrounding petitioner's special account is correct, such as to provide an account to meet margin requirements and the like. Respondent relies on a protest letter dated December 3, 1985, from petitioner's certified public accountant who prepared the income tax return at issue, Don Britton, to the *727 District Director contesting the Form 886-A examination report for 1983 for petitioner. Respondent argues that the letter is inconsistent with petitioner's evidence. We disagree that there are any significant differences. We are aware of Don Britton's use of the term "commission" to describe the funds in question; however, the substance of the letter is that petitioner was not an employee. We conclude that the protest letter gives an explanation of the arrangement between petitioner and Barnes Brokerage that is essentially consistent with the rest of petitioner's evidence. Respondent also relies on a letter dated January 23, 1984, from Barnes to a revenue agent auditing petitioner. The letter states that petitioner earns commissions on his own trades. Since petitioner's 1983 return had not yet been filed, it appears the letter relates to an audit for a taxable year prior to the one now before the Court. Respondent properly objected at trial to our consideration of a position taken by the Commissioner in a prior audit of petitioners. Since we do not consider respondent's position taken in that prior audit and we do not know the issues being considered in that audit, we also *728 do not consider correspondence which apparently related to it. Respondent views the arrangement between Barnes Brokerage and petitioner as one where petitioner is paid a commission because he brings business to Barnes Brokerage. We think a better description is that petitioner pays Barnes for a llowing petitioner to do his own business through Barnes Brokerage. Petitioner used the resources of Barnes Brokerage to place trades on his own account and for partnerships of which he was a partner. He was in substance a customer of Barnes Brokerage, not an employee. Accordingly, we conclude that the $ 258,611.50 amount returned to petitioner is not commission income to petitioner, but is a reduction of the purchase price of commodities traded through Barnes Brokerage. 2. Taxation of Commission Income
Respondent argues that commissions paid to a broker are taxable income, citing Spreckels v. Helvering, 315 U.S. 626 (1942); Helvering v. Winmill, 305 U.S. 79 (1938); Commissioner v. Minzer, 279 F.2d 338 (5th Cir. 1960); Heggestad v. Commissioner, 91 T.C. 778 (1988); Williams v. Commissioner , 64 T.C. 1085 (1975); *729 and Kobernat v. Commissioner, T.C. Memo. 1972-132. However, these cases apply only if we find that the funds received by the broker were commission income rather than a return of the broker's funds. As stated above, we have not so found. In light of our finding, we need not address those cases. 3. Application of Section 707(a)
Respondent also asserts that the amounts paid by Barnes Brokerage to petitioner are taxable to petitioner under section 707(a), stating on brief: The evidence of record in this case requires a finding for respondent * * * due to the fact that Shotts also conducted trades for which he received payments in behalf of his partnership accounts, and these payments are clearly taxable * * * within the scope of section 707(a). It is also clear that section 707(a) makes [Benjamin v.] Hoey [139 F.2d 945 (2d Cir. 1944)] invalid. Heggestad [v. Commissioner, 91 T.C. 778 (1988)], supra.
Section 707(a) provides that if a partner engages in a transaction with a partnership other than in his capacity as a partner of the partnership, including the provision of services, the *730 transaction shall be treated as occurring *2124 between the partnership and one who is not a partner. If section 707(a) applies, the payment to the partner is treated as if it were for services provided to the partnership. However, for section 707(a) to apply here, it must first be found that amounts remitted to petitioner by Barnes Brokerage are not merely a return of funds to petitioner. We have not so found. Accordingly, section 707(a) does not apply, and we need not decide the portion of petitioner's commodities activities related to the partnerships. 4. Petitioners' Proof
At issue in this case was the character of amounts that petitioner received from Barnes Brokerage. Respondent contended that the amounts returned to petitioner were commissions. Respondent argued on brief: A most important and crucial factor in this case is that petitioners did not produce their own books and records, and did not request or subpoena Barnes to produce company books and records to show the fees, the accounts for which Shotts conducted trades or the breakdown between Shotts' transactions for his personal accounts and the partnership accounts. * * * It is well settled that the failure *731 of the petitioners to produce evidence available to them creates a presumption that, if produced, that evidence would have been unfavorable to petitioners. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947).
We disagree with respondent on this point. Petitioners may offer credible evidence, including testimony, to attempt to carry their burden of proof. Here, we are persuaded by petitioners' witnesses that the amounts at issue were not commissions, but were funds returned to petitioner as a result of his agreement with Barnes Brokerage. A detailed record of each trade is not necessary for us to reach this conclusion. At trial petitioner offered testimony to show what portion of his commodities activities at Barnes Brokerage was related to his partnerships. This would have been an issue here if we had held that section 707 applied. We have not so held, and so we need not decide what portion of petitioner's commodities activities related to his partnerships. In light of the foregoing, Decision will be entered for the petitioners.